UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ALABAMA
NORTHEASTERN DIVISION

STANLEY STEWART,           ]
                           ]
        Plaintiff(s),      ]
                           ]
     vs.                   ]        CV-01-CO-1142-NE
                           ]
PPG INDUSTRIES, INC.,      ]
                           ]
        Defendant(s).      ]

**ENTERED**

JUL 1 4 2003

MEMORANDUM OF OPINION

## I.   INTRODUCTION.

Presently before the court is a motion for summary judgment, filed by the defendant on April 5, 2002 [Doc. # 38], as well as a motion to strike, filed by the defendant on May 13, 2002 [Doc. # 54]. The issues raised in the motions have been fully briefed by the parties, and are now ripe for decision. Upon due consideration, the court is of the opinion that the motion to strike is due to be denied, and the motion for summary judgment is due to be granted in all respects.

## II.  FACTS.[1]

Plaintiff Stanley Stewart ("Mr. Stewart") began working for defendant PPG Industries, Inc., ("PPG"), a manufacturer of airplane

---

[1]The facts set out below are gleaned from the parties' submissions of facts claimed to be undisputed, their respective responses to those submissions, and the court's own examination of the evidentiary record. All reasonable doubts about the facts have been resolved in favor of the nonmoving party. *See Info. Sys. & Networks Corp. v. City of Atlanta*, 281 F.3d 1220, 1224 (11th Cir. 2002). These are the "facts" for summary judgment purposes only. They may not be the actual facts. *See Cox v. Adm'r U.S. Steel & Carnegie Pension Fund*, 17 F.3d 1386, 1400 (11th Cir. 1994).



windshields and windows, at its Works 22 facility in Huntsville, Alabama, on or about December 3, 1996. He was terminated on March 30, 2000, and his termination was affirmed on April 13, 2000.

A.   The Manual and other relevant PPG policies.

At all relevant times, PPG had a Production and Maintenance Manual ("the Manual") covering employees such as Mr. Stewart. The Manual contains a General Plant Rules and Disciplinary Policy. Mr. Stewart testified that he was aware of the Manual and its contents.

The disciplinary policy set forth in the Manual provides that "there are offenses that are of such a serious nature that they may result in immediate discharge;" among those offenses are falsification of records, insubordination, and absences. (The Manual, at A-63.) The Manual provides that under some circumstances, a "supervisor can take immediate action to remove an employee from the plant for rules violations. If this is done, the employee is in effect, 'suspended pending investigation,' and such action will be reviewed at the earliest possible time to finalize the disciplinary action to be imposed." (*Id.* at A-68 to A-69.)

PPG also has a Family and Medical Leave Policy, under which an employee wishing to obtain Family and Medical Leave is required to apply for leave in accordance with the policy. Mr. Stewart was aware of the procedure whereby an employee was required to complete a PPG certification form requesting leave pursuant to the Family and Medical Leave Act ("FMLA"). Additionally, PPG requires every

employee taking FMLA leave for his own medical condition to obtain a supporting medical certification form from a health care provider. It is undisputed that Mr. Stewart did not apply for FMLA leave at any time between May 4, 1999, and his termination on March 30, 2000.

In addition to the policies contained in the Manual, PPG has a Salary Continuance Policy, which is a short-term disability benefit program that pays an employee's salary when he is disabled and under a physician's care for longer than six days. To receive salary continuance benefits, the employee must submit paperwork, a portion of which must be completed by a physician, within fourteen days of the absence in question. Upon denial of a claim for Salary Continuance, an employee may request that the plan administrator review the denial of benefits. Under the plan, a claimant may seek legal recourse only after pursuing the claims procedure, up to and including review of an initial denial of benefits.

Effective July 1, 1999, PPG promulgated a new attendance policy, which provided that "[a]ny absenteeism discipline issued while an employee is in the accelerated program for absentee control [for four 'occurrences' of unexcused absence within a rolling twelve month period] will be issued progressively in consideration of all other active discipline in the employee's record." (DiVasto Dep. Ex. 4.) A full day of unexcused absence constitutes an occurrence, up to three consecutive days are counted

as one occurrence, and two partial days of unexcused absence are considered one occurrence. If an employee incurs four occurrences, the employee is placed in the accelerated program for absenteeism control, at which time "the employee's attendance record [is] closely monitored with further absences possibly resulting in disciplinary action up to and including discharge." (DiVasto Dep. Ex. 4.) Any absences for which an employee receives FMLA leave or salary continuance does not constitute an unexcused absence under the attendance policy.

B.   Mr. Stewart's illness and his 1999 absences.

According to his testimony, Mr. Stewart has suffered intermittent episodes of gastrointestinal complaints for some time; he has been seen by Drs. Bryan Evans, Rajesh Patel, and Robert Pendley, a gastroenterologist, for these problems.

Between July 1, 1999, and October 15, 1999, Mr. Stewart had 6.5 occurrences of unexcused absences, which placed him in the accelerated program for absentee control.[2] Three of these occurrences took place between October 7 and October 15, 1999, during which time Mr. Stewart missed seven days of work; if he had qualified for salary continuance for this period, these absences would not have counted as unexcused absences. It is undisputed that Mr. Stewart saw Dr. Pendley on October 4, 1999, and was prescribed

_____

[2]Mr. Stewart alleges that he was never notified that he had been placed in the accelerated program; however, the court cannot find in the record a requirement that an employee placed in this program be notified of the placement.

Prilosec, a drug that Dr. Pendley testified would not prevent Mr. Stewart from working. Moreover, according to Mr. Stewart, he called Dr. Evans's office on October 7, 1999, and was told that the earliest available appointment was on October 11;[3] Mr. Stewart saw Dr. Evans on October 11, and Dr. Evans determined that he would be able to return to work on October 15, 1999. However, Mr. Stewart did not return to work on that date.

Having received no request for salary continuance benefits for his October absences, Human Resources Supervisor Nancy DiVasto ("Ms. DiVasto") sent Mr. Stewart a memorandum on October 25, 1999, reminding him of his responsibility to submit medical documentation to obtain salary continuance and providing him seven days within which to submit it.

In response to Ms. DiVasto's letter, Mr. Stewart had Dr. Evans send PPG via facsimile on November 5, 1999, medical records and a note from Dr. Evans's office in support of Mr. Stewart's request for salary continuance. The note stated that Mr. Stewart had been under Dr. Evans's care from October 7, 1999 through October 15, 1999, and that Mr. Stewart had called on October 7, but Dr. Evans did not have appointments available until October 11. Notwithstanding the information contained in this note, PPG concluded that Mr. Stewart was not unable to work for six

---

[3]The defendant alleges that Dr. Evans's records do not reflect that Mr. Stewart contacted the office on October 7, 1999, and that if he had, he could have been seen by Dr. Evans before October 11.

consecutive workdays while under a physician's care. Therefore, he was denied salary continuance, and he did not appeal this determination. Mr. Stewart received further chargeable absences on November 2, 1999, and December 14, 1999, bringing his total for the period from July 1, 1999, through December 14, 1999, to 8.5.

C.   The February 2000 absences.

Mr. Stewart was absent from work from February 14, 2000, through February 22, 2000. On February 8, 2000, Mr. Stewart was seen by Dr. Pendley for nausea and upper abdominal discomfort. Dr. Pendley scheduled an endoscopy for February 14, 2000, and a colonoscopy for February 21, 2000; both tests were negative. Between February 15, 2000, and February 18, 2000, Mr. Stewart did not see a doctor other than a brief visit to Dr. Walley, the company doctor, for a routine checkup on February 17, 2000. On February 15, 2000, Mr. Stewart notified company nurse Catrina Massey ("Ms. Massey") that he had appointments on February 15 and 16 with Dr. Pendley to have tests run; however, Dr. Pendley's office has no record of any such appointments, and Mr. Stewart was not seen by Dr. Pendley on either day.[4]

On Friday, February 18, 2000, Ms. Massey telephoned Dr. Pendley to confirm Mr. Stewart's appointments, but was told that he

---

[4]In his deposition, Mr. Stewart stated that he does not specifically recall this conversation, but does not deny that it occurred. Although his subsequent affidavit testimony indicates that he did not represent to anyone at PPG that he had any tests scheduled on February 15 or 16, this testimony is due to be disregarded as inconsistent with his deposition testimony. *See Van T. Junkins v. U.S. Industries, Inc.*, 736 F.2d 656 (11th Cir. 1983).

had no appointments scheduled for February 15 or 16. Ms. Massey notified Ms. DiVasto of the discrepancy later that day, and, as a result, Ms. DiVasto had a letter delivered to Mr. Stewart that day. The letter requested that Mr. Stewart produce his medical records to PPG on February 22, 2000, before the start of his scheduled work shift. The letter further stated: "Please be advised that failure to comply with this request could result in discipline. You are expected to report to your regular shift on Tuesday, February 22, 2000." (Stewart Dep. Ex. 42.) Upon receipt of this letter, Mr. Stewart left a message on Ms. DiVasto's voicemail, stating that he would not return to work until his doctor said he could.

On Monday, February 21, 2000, in response to the voice mail left by Mr. Stewart the previous Friday, PPG's Kurt Loring ("Mr. Loring") had delivered to Mr. Stewart another letter, which instructed Mr. Stewart to report to work on February 22, 2000. On February 21, 2000, the date of Mr. Stewart's colonoscopy, Dr. Pendley noted in his records that "[t]he patient is requesting a statement reflecting the degree of illness so that he can obtain short-term disability, but at this time, I am not certain it is justified." (Pendley Dep. Ex. 4.) Also on that date, Dr. Pendley gave Mr. Stewart a note stating as follows: "Mr. Stewart has been undergoing diagnostic studies from 2/14/00 through today – Others are scheduled & would extend somewhat beyond Wed. 2/23/00. May need work adjustments temporarily." In his deposition, Dr. Pendley

explained that he did not consider it necessary for Mr. Stewart to be off for more than the day of the endoscopy and the day of the colonoscopy. He further explained that the "work adjustments" referenced in his note had to do with adjusting Mr. Stewart's schedule so he could go to the doctor on the dates tests were scheduled, not that he needed off from February 14 through February 25, 2000.

At some point subsequent to February 21, Ms. DiVasto made a note of a telephone message she left for Mr. Loring regarding the information PPG had received from Dr. Pendley. The note states:

> First of all, very good news. In the doctor's notes from the 21st, which was Monday, the day that he got the little note he brought into us, it says "The patient is requesting a statement reflecting degree of illness so that he can obtain short-term disability, but at this time I am not certain that it is warranted."

(DiVasto Dep. Ex. 32.)

D.    February 22, 2000.

On Tuesday, February 22, 2000, Mr. Stewart did not report for work; in fact, he called in sick on that date. He did, however, go to the company medical department that day to drop off a medical release form which allowed Dr. Pendley's office to release Mr. Stewart's medical records, along with the February 21, 2000, note from Dr. Pendley. Upon arriving at PPG, Mr. Stewart was told to wait until Mr. Loring was available to meet with him; however, Mr. Stewart left without seeing Mr. Loring because, according to Mr.

Stewart, he became ill and vomited, and Ms. Massey told him he could go home.

Also on February 22, company physician Dr. Garber sent a letter to Dr. Pendley requesting Mr. Stewart's medical records. PPG received a partially completed Attending Physician's Statement and copies of Dr. Pendley's medical records on February 24, 2000. On February 29, 2000, Dr. Pendley sent PPG a completed Attending Physician's Statement, which states that Mr. Stewart was able to return to work on February 25, 2000.

E.   The suspension.

On February 23, 2000, Mr. Stewart was suspended pending investigation, according to the procedure outlined in the Manual. Ms. DiVasto testified that inconsistencies between Mr. Stewart's explanation for his time off and Dr. Pendley's office's records raised suspicions about whether his explanation was truthful, and Mr. Stewart's failure to cooperate in resolving the matter convinced her that suspension pending investigation was warranted.

F.   Denial of salary continuance.

PPG sent Mr. Stewart a letter dated February 23, 2000, which stated:

> The Medical Department has . . . informed [PPG] that you have been undergoing some diagnostic testing. This testing may be covered under the [FMLA]. You may request FMLA leave. For proper consideration, the enclosed FMLA forms must be completed by March 8, 2000 and returned to Nancy DiVasto.

(DiVasto Dep. Ex. 19.) It is clear that Mr. Stewart did not apply for FMLA leave for the February 2000 absences. In any event, based on the medical records, Mr. Stewart was determined to be ineligible for FMLA leave and salary continuance for the period February 15-21, 2000. Ms. DiVasto concluded that the medical records established that Mr. Stewart was unable to work for only a single day – February 21 – of the period, making him ineligible for salary continuance. Mr. Stewart did not seek review of the denial of the salary continuance benefits.

   G.   The charge.

   Mr. Stewart filed a charge of discrimination with the EEOC on March 3, 2000. Prior to receiving the March 3, 2000, charge, Ms. DiVasto notified Mr. Stewart by letter dated March 6, 2000, that salary continuance benefits were denied. PPG received a copy of the charge on March 8, 2000.

   H.   The investigation and termination.

   On March 9, 2000, company physician Dr. Garber wrote Dr. Pendley a letter seeking clarification, which asked whether "Mr. Stewart [was] out of work on [Dr. Pendley's] recommendation." (Garber Dep. Ex. 14.) Dr. Pendley's response, dated March 20, 2000, provides in relevant part as follows:

> I am not aware of any reason from a GI standpoint to support any claim by Mr. Stewart of a chronic disability. At the most, his evaluation would possibly support a functional GI distress or irritable bowel syndrome, and that only on a subjective basis. The scheduled endoscopic procedures were one week apart with the upper

gastrointestinal endoscopy occurring first on the 14th of February and this procedure did not require any preparation. Therefore, except for the date of the office visit on the 8th of February, no other excuse is authorized in that time frame. In the week between the upper GI endoscopy and colonoscopy on the 21st, it would be reasonable to allow one or two days for preparation and the date of colonoscopy. Beyond that any days allowed was [sic] rest solely on the impression of the physician listening to the patient's story. I do recall that he continued to complain of some nausea. I also noted however that the patient never appeared to be as ill on an objective basis as his subjective complaints.

(DiVasto Dep. Ex. 29.) Upon receipt of Dr. Pendley's response, PPG terminated Mr. Stewart's employment by letter dated March 31, 2000, which provided as follows:

On February 22, 2000 you were suspended from employment at PPG Industries pending an investigation. As a result of your violation of several Plant Rules and disciplinary procedures, PPG has decided to terminate your employment, effective March 30, 2000. Specifically, commencing on February 15, 2000 and continuing until February 21, 2000 you were absent from work without medical documentation. Those days have been recorded as chargeable absences. In addition, on February 15 and 16 you provided false information to our medical department. You again falsified information on February 22 when reporting off to your supervisor. Also, on February 22 you were insubordinate when you refused to follow a directive to report to work as outlined in [PPG's] letters to you dated Feb[ruary] 18 and Feb[ruary] 21, 2000.

(Stewart Dep. Ex. 47.)

    I.    The appeal.

    Mr. Stewart appealed his termination to Robert Moore ("Mr. Moore") the General Manager for PPG's Aircraft Products Division. Mr. Moore has the authority to set aside termination decisions, and he has done so in the past when he concluded that the termination

was inconsistent with PPG policy or otherwise improper. Mr. Moore reviewed the information upon which Mr. Stewart's termination was based, listened to Mr. Stewart's side of the story, and determined on April 14, 2000, that termination was appropriate.

J.    Unemployment proceedings.

Subsequent to his termination, Mr. Stewart sought and was awarded unemployment compensation benefits from the Alabama Department of Industrial Relations. The unemployment appeals referee concluded that because PPG had not proven that Mr. Stewart's discharge was the result of an act of dishonesty, Mr. Stewart was not disqualified from receiving unemployment compensation benefits.

K.    Procedural history.

Mr. Stewart filed the instant action on May 4, 2001, alleging violations of Title VII of the Civil Rights Act of 1964, 42 U.S.C. §§ 2000e-2000e-17, and the FMLA, 29 U.S.C. §§ 2601-2654. Mr. Stewart alleges four claims: (1) a retaliation claim under Title VII; (2) an FMLA claim, alleging both that he was denied leave to which he was entitled under the FMLA, and that he was terminated from his employment in violation of the FMLA; (3) a breach of contract claim alleging wrongful termination; and (4) a breach of contract claim alleging that PPG unlawfully denied him salary continuance benefits for his February 2000 absences. PPG filed the

instant motion for summary judgment on April 5, 2002, and it filed a motion to strike on May 13, 2002.

III. STANDARD.

Summary judgment is proper "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c). The party moving for summary judgment "always bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of [the evidence] which it believes demonstrate the absence of a genuine issue of material fact." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). The movant can meet this burden by presenting evidence showing that there is no genuine dispute of material fact, or by showing that the nonmoving party has failed to present evidence in support of some element of its case on which it bears the ultimate burden of proof. *Celotex*, 477 U.S. at 322-23. In evaluating the arguments of the movant, the court must view the evidence in the light most favorable to the nonmoving party. *Mize v. Jefferson City Bd. of Educ.*, 93 F.3d 739, 742 (11th Cir. 1996).

Once the moving party has met his burden, Rule 56(e) "requires the nonmoving party to go beyond the pleadings and by her own affidavits, or by the 'depositions, answers to interrogatories, and

admissions on file,' designate 'specific facts showing that there is a genuine issue for trial.'" *Celotex*, 477 U.S. at 324 (quoting Fed. R. Civ. P. 56(e)). "A factual dispute is genuine only if a 'reasonable jury could return a verdict for the nonmoving party.'" *Info. Sys. & Networks Corp. v. City of Atlanta*, 281 F.3d 1220, 1224 (11th Cir. 2002) (quoting *United States v. Four Parcels of Real Property*, 941 F.2d 1428, 1437 (11th Cir. 1991)).

IV.  DISCUSSION.

    A.   Motion to strike.

    PPG has moved to strike a number of evidentiary items submitted by Mr. Stewart in opposition to the motion for summary judgment. The court has viewed all the evidence, including that evidence objected to by PPG, in the light most favorable to Mr. Stewart on the motion for summary judgment, and has concluded that, with the exception noted *supra*, at note 4, even if all of Mr. Stewart's evidence is admissible, summary judgment is due to be granted as to all of his claims. Therefore, the court need not address each of PPG's arguments with respect to the admissibility of evidence, and the motion to strike will be denied.

    B.   Motion for summary judgment.

        1.   Title VII claim.

    Title VII makes it unlawful for an employer to discriminate against an employee "because he has made a charge, testified, assisted, or participated in any manner in an investigation,

proceeding, or hearing under this title." 42 U.S.C. § 2000e-3(b).
Mr. Stewart alleges that he was terminated in retaliation for
filing a charge of discrimination with the EEOC on March 3, 2000.
Because he has presented no direct evidence of retaliatory intent,[5]
Mr. Stewart must establish his case of retaliation using the
familiar burden-shifting framework established in *McDonnell Douglas
Corp. v. Green*, 411 U.S. 792 (1973).

To establish a prima facie case of retaliatory discharge, the
plaintiff must show (1) he engaged in statutorily protected
activity, (2) an adverse employment action occurred, and (3) the
adverse action was causally related to his protected activity. *See,
e.g., Little v. United Techs., Carrier Transicold Div.*, 103 F.3d
956, 959 (11th Cir. 1997). To establish the third element, the
plaintiff must show that "the decision-makers [were] aware of the
protected conduct," and "that the protected activity and the
adverse action were not wholly unrelated." *Farley v. Nationwide
Mut. Ins.*, 197 F.3d 1322, 1337 (11th Cir. 1999). If the plaintiff
establishes his prima facie case, the burden shifts to the employer

---

[5]Direct evidence of discriminatory or retaliatory intent is evidence that, "if
believed, proves [the] existence of [a] fact in issue without inference or
presumption." *Burrell v. Bd. of Trustees of Ga. Military College*, 125 F.3d 1390,
1393 (11th Cir. 1997). For instance, a statement by the decision-maker that Mr.
Stewart was being fired for filing an EEOC charge would qualify as direct evidence
of retaliatory intent. Mr. Stewart alleges that Ms. DiVasto's note that it was "very
good news" that Dr. Pendley was not certain whether Mr. Stewart's condition
warranted disability benefits constitutes direct evidence of retaliatory intent.
(DiVasto Dep. Ex. 32.) However, the court is of the opinion that this statement is
not the kind of "blatant remark[ ], whose intent could be nothing other than to
[retaliate]" that qualifies as direct evidence. *Carter v. City of Miami*, 870 F.2d
578, 582 (11th Cir. 1989).

to articulate a legitimate, nondiscriminatory reason for the adverse employment action. *See, e.g.*, *Tipton v. Canadian Imperial Bank of Commerce*, 872 F.2d 1491, (11th Cir. 1989). If the employer does so, the plaintiff must proffer sufficient evidence to create a genuine issue of material fact regarding whether each of the employer's articulated reasons is mere pretext for retaliation in order to survive a motion for summary judgment. *Chapman v. AI Transp.*, 229 F.3d 1012, 1024-25 (11th Cir. 2000).

a.   Prima facie case.

It is undisputed that Mr. Stewart engaged in statutorily protected activity when he filed a charge of discrimination with the EEOC on March 3, 2000. It is likewise undisputed that Mr. Stewart was subjected to an adverse employment action when he was ultimately terminated on March 31, 2000. Therefore, in order to establish a prima facie case of retaliation, Mr. Stewart need establish only the requisite causal connection between these two events. The court is satisfied that he has done so. PPG knew that Mr. Stewart had filed a charge before it terminated him, and the termination took place less than a month after the charge was filed. Under these circumstances, it is clear that the two events "were not wholly unrelated." *Farley*, 197 F.3d at 1337. *See Goldsmith v. City of Atmore*, 996 F.3d 1155, 1163-64 (11th Cir. 1993) (awareness by decision-maker of protected conduct, in conjunction with temporal proximity of adverse employment action to

Page 16 of 30

protected conduct, is sufficient to create a factual issue about the causal link requirement). Therefore, Mr. Stewart has established a prima facie case of retaliatory discharge, and the burden shifts to the defendant to articulate one or more legitimate, nondiscriminatory reasons for his termination.

> b.    Legitimate, nondiscriminatory reasons.[6]

PPG has come forward with the following legitimate, nondiscriminatory reasons for terminating Mr. Stewart: Mr. Stewart had an excessive number of absences; Mr. Stewart provided false information to the medical department about the reason for his absence on February 15 and 16, 2000; and Mr. Stewart failed to report to work on February 22, 2000, after having been instructed to do so. By coming forward with those reasons, PPG has met its intermediate burden, and Mr. Stewart must provide some evidence from which a reasonable factfinder could conclude that the articulated reasons are mere pretext for discrimination.

> c.    Pretext.

Mr. Stewart argues that he has established pretext simply by calling into question the truth of PPG's articulated reasons. However, proof that the articulated reasons are false, standing alone, may not be sufficient to create a genuine issue of material

---

[6]As a threshold matter, the court addresses briefly Mr. Stewart's contention that PPG is collaterally estopped from litigating the reason for his termination because the Alabama Department of Industrial Relations found that he was not terminated for misconduct. It is well settled that unreviewed state administrative proceedings have no preclusive effect on Title VII claims. *Univ. of Tenn. v. Elliot*, 478 U.S. 788, 796 (1986). Thus, Mr. Stewart's collateral estoppel argument is unavailing, at least as to the Title VII claim.

fact as to pretext in every case. *See Chapman*, 229 F.3d at 1025 n.11. Moreover, to establish that the employer's articulated reasons are unworthy of credence for purposes of proving pretext, the employee must show that the employer did not, in good faith, believe in the truth of the asserted reasons; merely showing that the employer was mistaken will not suffice. *See Elrod v. Sears, Roebuck & Co.*, 939 F.2d 1466, 1470 (11th Cir. 1991).

The court is of the opinion that Mr. Stewart has not established that PPG's articulated reasons are not entitled to credence, nor has he established that the true reason for his termination was retaliation. Mr. Stewart has produced no evidence to dispute PPG's claim that he had accumulated 8.5 chargeable occurrences of absence between July 1 and December 14, 1999; having four chargeable occurrences placed Mr. Stewart in the accelerated program for absenteeism control, which program provided that his attendance record would "be closely monitored with further absences possibly resulting in disciplinary action up to and including discharge." (Stewart Dep. Ex. 16.) Thus, there is no reason to suspect that PPG did not have a good faith belief that Mr. Stewart had excessive absences.

As to the second articulated reason – that Mr. Stewart provided false information to the medical department on February 15 – the court concludes that Mr. Stewart has failed to raise a genuine issue as to whether PPG had a good faith belief that Mr.

Stewart engaged in such conduct. Although he does not recall telling Ms. Massey that he was having tests run on February 15 and 16, he does not dispute that he made such a statement. Moreover, regardless of whether he in fact made this statement to Ms. Massey, it is clear that PPG was operating under the good faith belief, based on Ms. Massey's report of the February 15 conversation, that Mr. Stewart had provided false information to the company. *See EEOC v. Total Sys. Servs., Inc.*, 221 F.3d 1171, 1176 (11th Cir. 2000) (the plaintiff did not establish pretext where she was unable to produce evidence that the defendant lacked a good faith belief that she lied in an investigation).

Finally, it is undisputed that Mr. Stewart was ordered to report for his shift on February 22, 2000, and that he failed to do so. Although Mr. Stewart claims that PPG's allegation that he was terminated for insubordination with respect to reporting to work on February 22 is false, his argument with respect to this reason is simply that his failure to report to work on that date does not constitute insubordination within the meaning of PPG's policies. However, asserting that PPG was wrong in its conclusion is insufficient to establish that this explanation for Mr. Stewart's termination is unworthy of credence. *See Elrod*, 939 F.2d at 1470. Thus, Mr. Stewart has failed to establish that any of PPG's proffered reasons for his termination are false or unworthy of credence. "In light of the ample legitimate reasons for the

termination decision proffered by [PPG], the truth of which was never effectively challenged," *see Wascura v. City of S. Miami*, 257 F.3d 1238, 1247 (11th Cir. 2001), the court concludes that Mr. Stewart has failed to come forward with evidence that could convince a reasonable factfinder that PPG's proffered reasons for terminating him are pretext for retaliation. Summary judgment as to the Title VII retaliation claim is therefore due to be granted.

2.   FMLA claims.

The FMLA entitles an eligible employee to, inter alia, twelve workweeks of leave during any twelve-month period "because of a serious health condition that makes the employee unable to perform the functions of the position of such employee." 29 U.S.C. § 2612. To secure the rights provided by the FMLA, the Act creates two types of claims aggrieved employees may bring against employers alleged to be in violation of the Act: interference claims, in which employees assert that their employers denied or otherwise interfered with their rights under the Act, and retaliation claims, in which employees assert that their employers discriminated against them because they engaged in activity protected by the act. *Strickland v. Water Works & Sewer Bd. of the City of Birmingham*, 239 F.3d 1199, 1206 (11th Cir. 2001). Mr. Stewart states both an interference and a retaliation claim. The court will address each separately.

a.   Interference.

To state a claim of interference under the FMLA, "an employee need only demonstrate by a preponderance of the evidence that he was entitled to [a] benefit denied." *Strickland*, 239 F.3d at 1207. Mr. Stewart contends that he was entitled to, but denied, FMLA leave with respect to his February 2000 absences. The court is of the opinion that Mr. Stewart's interference claim must fail as he has not produced sufficient evidence from which a reasonable factfinder could conclude that he was entitled to FMLA leave in February 2000. As an initial matter, the court notes that Mr. Stewart, having full knowledge of the usual FMLA leave procedures, and having received the February 23, 2000, letter from PPG notifying him of the opportunity to apply for FMLA benefits, did not apply for FMLA benefits for his February 2000 absences.

Moreover, even if he had requested FMLA leave, the court concludes that Mr. Stewart has failed to demonstrate his entitlement to that leave. "[N]ot all leave requested or taken for medical reasons qualifies for the FMLA's protections. For this reason, employers have a statutory right to require an employee requesting FMLA leave to obtain certification that attests to the employee's eligibility for such leave from a health care provider." *Cash v. Smith*, 231 F.3d 1301, 1307 (11th Cir. 2000). Under PPG's policy, of which Mr. Stewart was aware, an employee seeking FMLA leave must produce a supporting medical certification for the

absence. Mr. Stewart "did not provide [PPG] with certification that [his] medical conditions met the statutory standard," *Cash*, 231 F.3d at 1307; in fact, the medical records supplied by his treating physician for the time period in question indicate that Mr. Stewart's conditions did *not* meet the statutory standard.

Dr. Pendley noted, "I am not aware of any reason from a GI standpoint to support any claim by Mr. Stewart of a chronic disability." (DiVasto Dep. Ex. 29.) Dr. Pendley concluded, as to the dates Mr. Stewart was off work in February 2000, that "except for the date of the office visit on the 8th of February, no other excuse is authorized in that time frame." (*Id.*) Given these comments by Mr. Stewart's treating physician, the court concludes that Mr. Stewart has not adduced sufficient evidence from which a reasonable factfinder could conclude that his February absences were taken "because of a serious health condition that makes the employee unable to perform the functions of the position of such employee." 29 U.S.C. § 2612. *See Bauer v. Dayton-Walther Corp.*, 118 F.3d 1109, 1112 (6th Cir. 1997). As such, no reasonable factfinder could conclude that "the medical leave that [he] did take was [protected] under the auspices of the FMLA," *Cash*, 231 F.3d at 1307, and as such, summary judgment is due to be granted as to Mr. Stewart's FMLA interference claim.

b.   Retaliation.

To succeed on an FMLA retaliation claim, "an employee must demonstrate that his employer intentionally discriminated against him in the form of an adverse employment action for having exercised an FMLA right." *Strickland*, 239 F.3d at 1207. As explained *supra*, at note 5, Mr. Stewart presents no direct evidence of retaliatory intent; therefore, his FMLA claim proceeds under a burden-shifting analysis. To state a prima facie case of retaliation, Mr. Stewart must allege that: (1) he engaged in a statutorily protected activity; (2) he suffered an adverse employment action; and (3) the decision was causally related to the protected activity. *Id.* As with Title VII retaliation claims, if Mr. Stewart establishes a prima facie case of retaliation, the employer has the burden of articulating a legitimate, nondiscriminatory reason for the adverse action, and Mr. Stewart is left with the ultimate burden of proving that the reason or reasons articulated by the employer are mere pretext for retaliation. *Cf.* *Chapman*, 229 F.3d at 1024-25.

The court is not satisfied that Mr. Stewart has presented evidence sufficient to state a prima facie case and to thereby raise an inference of retaliation. Although Mr. Stewart was terminated from his employment in March 2000, thus establishing the second element of the prima facie case, there is no evidence to suggest that Mr. Stewart engaged in some statutorily protected

activity that resulted in his termination. Specifically, it is undisputed that Mr. Stewart did not apply for FMLA leave with respect to his February 2000 absences, and, as the court has already concluded, there is no evidence to support a conclusion that the February absences would have qualified for FMLA leave in any event. Having failed to establish that he asked for and/or was entitled to FMLA leave, Mr. Stewart cannot establish that he engaged in some statutorily protected activity, nor can he establish a causal connection between any protected activity and his ultimate termination. *See Brungart v. Bellsouth Telecomms., Inc.*, 231 F.3d 791, 800 (11th Cir. 2000) ("Because the evidence is unrefuted that . . . the decision maker . . . did not know [the plaintiff] had requested . . . medical leave, [the plaintiff] failed to create a genuine issue of fact as to a causal connection between her termination and her . . . request for [leave]. Accordingly, she failed to establish a prima facie case of retaliation under the FMLA."). Because Mr. Stewart cannot establish a prima facie case of retaliation under the FMLA, summary judgment as to that claim is due to be granted.[7]

_____

[7]Because the court concludes that Mr. Stewart has not established a prima facie case of FMLA retaliation, it need not reach PPG's articulated reasons for terminating Mr. Stewart. As such, the court will not address Mr. Stewart's argument that PPG should be collaterally estopped from asserting that Mr. Stewart was terminated for misconduct, rather than in retaliation for engaging in conduct protected under the FMLA, because the Alabama Department of Industrial Relations found that his termination was not based on his misconduct.

Page 24 of 30

3.    Breach of contract claims.

In Counts Three and Four of his complaint, Mr. Stewart alleges that he had an employment contract with PPG that PPG breached by terminating him without cause, and by failing to award him salary continuance benefits for his February 2000 absences. In order to survive a motion for summary judgment on the breach of contract claim, Mr. Stewart must come forward with evidence from which a reasonable factfinder could conclude (1) that a contract between the parties existed; (2) that PPG breached the contract; and (3) that he was damaged as a result of the breach. *Sokol v. Bruno's, Inc.*, 527 So. 2d 1245, 1247-48 (Ala. 1988). With this framework in mind, the court will address each of Mr. Stewart's breach of contract claims in turn.

a.    Termination.

Mr. Stewart alleges he had an employment contract with PPG that provided that he "could only be terminated . . . in accordance with [the Manual's] policies," and that it breached that contract when it terminated Mr. Stewart "without cause as provided in [PPG's] policies." (Compl. ¶¶ 25-26.) It is true that under certain circumstances, an implied contract will arise out of the use of an employee handbook. *See, e.g., Hoffman-La Roche, Inc. v. Campbell*, 512 So. 2d 725 (Ala. 1987). However, even if Mr. Stewart could establish that the Manual and the attendance policy gave rise to an implied employment contract, the court is of the opinion that the

terms of that contract would not include any requirement that Mr. Stewart be terminated only in accord with the progressive discipline policy set forth in the Manual. In fact, the language in PPG's policies infer quite the opposite.

Specifically, the Manual's disciplinary procedure section provides that while "[d]ischarge is the 'last resort' and will be used only when other corrective measures fail," the policy also provides that "there are offenses that are of such a serious nature that they may result in immediate discharge," without regard to the other steps in the progressive discipline scheme. (The Manual, at A-63.) Additionally, the attendance policy states that when an employee is in the accelerated program for absenteeism control, "the employee's attendance record will be closely monitored with further absences possibly resulting in disciplinary action up to and including discharge." (DiVasto Dep. Ex. 4.) Based on these provisions of the documents in question, the court concludes that there is no evidence from which a reasonable factfinder could conclude that there was an employment contract between Mr. Stewart and PPG that entitled PPG to terminate Mr. Stewart only in accord with the progressive disciplinary procedures set forth in the Manual. Because Mr. Stewart has failed to raise a genuine issue of material fact as to an essential element of his breach of contract claim based on his termination, PPG's motion for summary judgment is due to be granted as to that claim.

b.   Denial of salary continuance benefits.

Finally, Mr. Stewart contends that he was denied salary continuance benefits in breach of the Salary Continuance Policy contained in PPG's Disability Benefits pamphlet. The defendant argues, and the court agrees, that Mr. Stewart's breach of contract claim based on the denial of salary continuance benefits is due to be dismissed because it relates to an employee benefit plan, and is therefore preempted by the Employee Retirement Income Security Act ("ERISA"), 29 U.S.C. §§ 1001-1200. *See, e.g.*, *Gilbert v. Alta Health & Life Ins. Co.*, 276 F.3d 1292 (11th Cir. 2001); *Love v. Fortis Benefits Ins. Co.*, 120 F. Supp. 2d 997 (M.D. Ala. 2000); *Seales v. The Amoco Corp.*, 82 F. Supp. 2d 1312 (M.D. Ala. 2000). Under these circumstances, the proper course might be to dismiss this claim without prejudice to the right of the plaintiff to amend his complaint to state an ERISA claim in its place. *See Hardy v. Welch*, 135 F. Supp. 2d 1171, 1185 (M.D. Ala. 2000). If the court considers granting that opportunity to Mr. Stewart, then the question of whether he has complied with the administrative prerequisites to suit under ERISA is properly before the court at this time. Therefore, the court will treat Count Four of the complaint as stating a claim under ERISA, and will address the defendant's motion for summary judgment as to that claim.

Under Eleventh Circuit jurisprudence, a plaintiff in an ERISA action "must exhaust available administrative remedies before suing

in federal court." *Counts v. Am. Gen. Life & Accident Ins. Co.*, 111 F.3d 105, 108 (11th Cir. 1997). The exhaustion requirement may be excused in the court's discretion "when resort to administrative remedies would be futile or the remedy inadequate." *Counts*, 111 F.3d at 108. PPG alleges, and Mr. Stewart does not dispute, that he failed to exhaust administrative remedies prior to filing suit. Specifically, Mr. Stewart did not seek administrative review of the denial of salary continuance benefits for his February 2000 absences, as provided in the Salary Continuance Policy. Mr. Stewart claims he should be excused from his failure to exhaust because he alleges that administrative review of the decision would have been futile.

His evidence of futility, however, is nonexistent. He claims that "the requisite futility is supplied by the fact that [he] was terminated on March 31, 2000, after having been denied salary continuance on March 6." [Doc. # 50, at 35.] The court is of the opinion that this fact is wholly irrelevant to a determination of whether resort to administrative review of the denial of salary continuance benefits would have been futile. "[S]uch bare allegations of futility are no substitute for the 'clear and positive' showing of futility . . . required before suspending the exhaustion requirement." *Springer v. Wal-Mart Assocs. Group Health Plan*, 908 F.2d 897, 901 (11th Cir. 1990) (quoting *Makar v. Health Care Corp.*, 872 F.2d 80, 83 (4th Cir. 1989)). There is no evidence

to suggest that PPG would have summarily denied Mr. Stewart's claims without giving him an adequate opportunity to explain his position at the administrative review stage. *See Kirkland v. SSL Ams., Inc.*, No. 02-A-1139-N, 2003 U.S. Dist. Lexis 8753 (M.D. Ala. May 20, 2003).

As Mr. Stewart's futility objections "are merely theoretical," they "do not justify [his] excusal from the exhaustion requirement." *Perrino v. S. Bell Tel. & Tel. Co.*, 209 F.3d 1309, 1319 (11th Cir. 2000). Because his breach of contract claim is preempted by ERISA, and because Mr. Stewart must exhaust administrative remedies before bringing an ERISA suit, but the court has found that he has not done so, the court is of the opinion that summary judgment as to Count Four of the complaint is due to be granted whether that claim is construed as a breach of contract claim, or as one arising under ERISA.

V.   CONCLUSION.

In sum, the court is of the opinion that the motion for summary judgment is due to be granted in all respects, without regard to whether the court considers any inadmissible evidence submitted by Mr. Stewart in opposition to the motion for summary judgment. Therefore, the motion to strike will be denied. The court will enter an appropriate order in conformity with this memorandum of opinion.

Done, this _____ of  July, 2003.

_____
L.  SCOTT  COOGLER
UNITED STATES DISTRICT JUDGE

F:\WPDOCS\Coogler\CLERK2\Danielle\Memoranda\DISCRIMINATION   CASES\FMLA\Stewart   v.   PPG,
CV-02-CO-1142-NE, summary judgment opinion FMLA.wpd